[No. D010668. Fourth Dist., Div. One. Sept. 24, 1990.]

HERBERT C. SAVAGE, Plaintiff and Appellant, v.
TRAMMELL CROW COMPANY, INC., et al., Defendants and
Respondents.

**COUNSEL**

Herbert C. Savage, in pro. per., for Plaintiff and Appellant.

Gans & Blackmar, Robert M. Gans and Keith A. Jones for Defendants and Respondents.

## OPINION

**BENKE, J.—**

### INTRODUCTION

In this case a security guard for a shopping center prevented plaintiff Herbert C. Savage from distributing religious tracts in the shopping center parking lot. In response Savage filed a complaint against the management company which is responsible for operation of the shopping center and the security company which employed the guard. Among other relief, Savage sought a preliminary injunction permitting him to distribute his tracts in the parking lot. In opposing Savage's application for an injunction, the shopping center argued litter and traffic problems justified its prohibition on leafletting in the center's parking lot. The trial court denied the injunction as well as Savage's request the trial judge disqualify himself because of the trial judge's religious beliefs.

In addition to opposing Savage's request for injunctive relief, the management company brought a demurrer to the complaint on the grounds Savage had no right to engage in other than political petitioning anywhere at the shopping center. The trial court sustained the demurrer without leave to amend and entered an order dismissing the complaint.

We affirm in part and reverse in part. The owner of a shopping center may impose reasonable limits on the time, place and manner of such activity. We conclude the shopping center presented persuasive evidence its prohibition against leafletting in the parking lot is such a limitation. Thus, we affirm the order denying Savage a preliminary injunction allowing leafletting in the parking lot. We also affirm the trial judge's refusal to disqualify himself. However, the owner or operator of a shopping center may not draw distinctions between "political" and "religious" speech. Thus, the defendants' written prohibition against nonpolitical expression gave rise to a cause of action against them. Accordingly we reverse the judgment dismissing the complaint.

### SUMMARY

According to his verified complaint, Savage went to the Del Norte Plaza Shopping Center in Escondido on May 25, 1989, and attempted to place gospel tracts on cars in the parking lot.[1] Savage was stopped by a security

---

[1] The tracts depict the crucifixion of Jesus Christ, state "All this I did for Thee" and set forth 22 quotations from the Bible. Each tract states: "Please send this tract to us to let us know that after reading it, you have decided to trust Jesus Christ as your Saviour" and provides an address for the Fellowship Tract League in Lebanon, Ohio.

guard who told him the parking lot was private and that he had no business putting the tracts on cars in the shopping center.

On the following day, Savage spoke with Brenda Foster, an employee of defendant Trammell Crow Company, Inc. (Trammell Crow). Trammell Crow manages the shopping center. According to Savage, Foster told him she would not permit him to distribute his gospel tracts in the parking area of the shopping center and that the policy was her policy.

On June 2, 1989, Savage filed a complaint against Trammell Crow and the security service for the shopping center, defendant Heritage Security Services, Inc. (Heritage). The complaint alleged the defendants' conduct violated Savage's constitutional rights.

On the same day Savage filed his complaint, the superior court issued an order to the defendants to show cause why a preliminary injunction permitting Savage to distribute his tracts should not issue. In particular the order stated the defendants would be restrained from the "threatened arrest, arrest, [harassment], and prosecution of plaintiff for distribution of religious tracts in parking areas of Del Norte Plaza Shopping Center."

In response to the order to show cause, Trammell Crow submitted the declaration of one of its partners, Ron Burns. Burns stated Del Norte Plaza had certain " 'Rules and Regulations Relating to Use of Shopping Center Property for Purposes of Political Expression.' " According to Burns's declaration, the rules and regulations provide in part: " 'These rules shall not, by implication or otherwise, be deemed or construed to permit any activity other than Political Expression [as defined], and the owners of the center reserve the right to prohibit any activity other than that specifically described in these rules.' " Burns's declaration further stated that the term "political expression" is defined by the rules and regulations as " 'activities . . . in obtaining signatures to any petition directed to any governmental or other political body or in disseminating political information.' "

With respect to leafletting in the parking lot, Burns stated: "We have consistently prohibited the distribution of leaflets, flyers and handbills in the parking lot, and we have uniformly applied that prohibition." A letter Burns sent to one of the center's tenants stated: "I am writing in regard to your [run-in] with Center Security on April 16, 1989 when flyers were being placed on vehicles in the parking lot. [¶] . . . Section 16, Paragraph 3 (Common Areas) of the Lease gives the Landlord the right to 'establish and enforce reasonable rules and regulations applicable to all tenants concerning the maintenance, management, use, and operation of the common areas'. [¶]My policy on flyers is that they are prohibited." The letter was attached to Burns's declaration.

On July 5, 1989, prior to the hearing on the order to show cause, Trammell Crow and Heritage filed a demurrer to Savage's complaint in which they alleged his complaint failed to state facts sufficient to constitute a cause of action. They argued the Supreme Court's opinion in *Robins* v. *Pruneyard Shopping Center* (1979) 23 Cal.3d 899 [153 Cal.Rptr. 854, 592 P.2d 341] (hereafter sometimes *Robins*), only provided California citizens with the right to conduct "political" activities at privately owned shopping centers. Because in distributing his gospel tracts Savage was advancing his religious beliefs, the defendants asserted they had the right to completely prohibit his activities at the shopping center. In the alternative they argued the center's prohibition on leafletting in the parking lot was a reasonable limitation on the time, place and manner of political or religious activity.

The trial court heard argument on the order to show cause on July 7, 1989, and refused to issue the preliminary injunction.

On July 17, 1989, Savage submitted to the court a motion for rehearing in which he alleged the judge who heard the order to show cause, Hon. Robert J. O'Neill, was a Roman Catholic and therefore biased against him and his efforts to spread the gospel.

Judge O'Neill heard argument on the demurrer on July 26, 1989, and sustained it without leave to amend. On the same day Judge O'Neill entered an order denying Savage's motion for rehearing.

Immediately following the hearing on the defendants' demurrer, Savage filed a notice of appeal from the order denying the preliminary injunction, the order sustaining the demurrer and the order denying his motion for rehearing.

An order dismissing the complaint was entered on August 16, 1989.

DISCUSSION

I

*Preliminary Injunction*

A. The Parking Lot Prohibition

The order to show cause which Savage filed asked the trial court to grant him the right to distribute religious tracts "in parking areas of Del Norte Plaza Shopping Center." Burns's declaration, submitted in opposition to the preliminary injunction, states: "A primary reason why . . . distribution [in the parking lot] has been prohibited is because of the litter which inevitably results when hundreds of flyers are distributed by one or more groups. This prohibition has been uniformly enforced regardless of the nature or contents

of the leaflets . . . . [¶]The parking facilities of the Del Norte Plaza are typical of other smaller centers. While trash containers are located in the Plaza's common area walkways adjacent to stores, we do not have trash containers placed in our parking facilities. In that regard, I believe that the placement of leaflets or flyers on unoccupied automobiles (or handing such flyers to individuals in the parking lot) would substantially increase the litter problem, as such handbills can be dislodged from unoccupied cars by wind; further, a patron of the center finding an unwanted leaflet on his automobile may be inclined to simply throw the leaflet on the ground as he is entering his car, as trash containers are not placed next to each parking space. Moreover, I am concerned that the distribution of such handbills within our parking facilities may unduly hamper ingress and egress patterns within the parking facilities, particularly if there are several individuals distributing such leaflets in the parking lot. This would not only inconvenience our patrons but potentially increase the occurrence of traffic accidents." As we have previously noted, attached to Burns's declaration was a letter he recently wrote to a tenant enforcing the parking lot prohibition.

██ ██ ██ ██ In seeking a preliminary injunction, Savage bore the burden of demonstrating both likely success on the merits and the occurrence of irreparable harm before a final judgment could be entered. (*Cohen* v. *Board of Supervisors* (1985) 40 Cal.3d 277, 286 [219 Cal.Rptr. 467, 707 P.2d 840].)[2] ██ In our view Burns's declaration was sufficient to defeat Savage's request for a preliminary injunction because the declaration demonstrated Savage was not likely to succeed in establishing a right to distribute his tracts in the parking lot. As we explain in greater detail below, the ban on parking lot leafletting is a valid regulation of the time, place or manner of activity otherwise protected by the California and federal Constitutions.

### B. Regulation of Time, Place, or Manner

In *Lloyd Corp.* v. *Tanner* (1972) 407 U.S. 551, 567-570 [33 L.Ed.2d 131, 141-144, 92 S.Ct. 2219], the United States Supreme Court held the right to free expression guaranteed by the First Amendment to the federal Constitution did not outweigh a shopping center owner's Fifth Amendment right to control its property. Thus in *Lloyd* the court held that, consistent with the First Amendment, a shopping center could prohibit distribution of leaflets which communicated no information relating to the center's business. (*Id.*

---

[2] "When a trial court denies an application for a preliminary injunction, it implicitly determines that the plaintiffs have failed to satisfy either or both of the 'interim harm' and 'likelihood of prevailing on the merits' factors. On appeal, the question becomes whether the trial court abused its discretion in ruling on *both* factors. Even if the appellate court finds that the trial court abused its discretion as to one of the factors, it nevertheless may affirm the trial court's order if it finds no abuse of discretion as to the other." (*Cohen* v. *Board of Supervisors, supra,* 40 Cal.3d 277 at pp. 286-287.)

at p. 570 [33 L.Ed.2d at pp. 143-144].) In *Robins* v. *Pruneyard Shopping Center, supra*, 23 Cal.3d at page 910, our Supreme Court held that unlike the First Amendment, California's Constitution protects the free speech and petition rights of California citizens even when those rights are exercised in a privately owned shopping center. Relying on article I, section 2, subdivision (a) of the California Constitution, the "liberty of speech" clause, the court in *Robins* found a shopping center could not prevent a group of high school students from soliciting signatures on a petition opposed to a United Nations resolution on "Zionism."

In extending the liberty of speech clause to private shopping centers, the court in *Robins* stated: "By no means do we imply that those who wish to disseminate ideas have free rein." (23 Cal.3d at p. 910.) Rather the court found that property owners may regulate the time, place and manner of such activity. (*Ibid.*) Indeed because of the owners' ability to regulate expressive activities, the court reasoned any intrusion on private property rights was limited. " 'A handful of additional orderly persons soliciting signatures and distributing handbills in connection therewith, under reasonable regulations adopted by defendant to assure that these activities do not interfere with normal business operations [citations] would not markedly dilute defendant's property rights.' " (*Id.* at p. 911.)

■ In giving private property owners the right to establish "time, place and manner" rules, the court used the same formulation it had employed in describing the power government possesses with respect to public forums and the conduct of activities protected by the First Amendment. (See e.g. *Dulaney* v. *Municipal Court* (1971) 11 Cal.3d 77, 84-85 [112 Cal.Rptr. 777, 520 P.2d 1]; *Dillon* v. *Municipal Court* (1971) 4 Cal.3d 860, 869-870 [94 Cal.Rptr. 777, 484 P.2d 945]; see also *In re Hoffman* (1967) 67 Cal.2d 845, 852-853 [64 Cal.Rptr. 97, 434 P.2d 353].) As the court in *Dulaney* v. *Municipal Court* explained, that formulation and the guidelines which our Supreme Court has developed for its use were "fashioned from a long line of United States Supreme Court cases." (11 Cal.3d at p. 84, fn. omitted.)

Thus, although Savage's right to engage in expressive activity at shopping centers is found solely in the broader protection provided by California's Constitution, a shopping center's power to impose time, place, and manner restrictions on such activity is nonetheless measured by federal constitutional standards. "In essence, *Robins* v. *Pruneyard Shopping Center, supra*, 23 Cal.3d 899, in affirming a shopping center owner's right to impose reasonable time, place and manner restrictions on petitioning activity, recognized in the owner important rights of substance; those rights are identified as freedom from disruption of normal business operations and freedom from interference with customer convenience. However, despite plaintiffs' characterization to the contrary, *Robins did not establish a new standard of*

*reasonableness to be applied to private property.*" (*H-CHH Associates* v. *Citizens for Representative Government* (1987) 193 Cal.App.3d 1193, 1208 [238 Cal.Rptr. 841], italics added; see also *Gonzales* v. *Superior Court* (1986) 180 Cal.App.3d 1116, 1123 [226 Cal.Rptr. 164]; *U. C. Nuclear Weapons Labs Conversion Project* v. *Lawrence Livermore Laboratory* (1984) 154 Cal.App.3d 1157, 1163 [201 Cal.Rptr. 837].)

■ Accordingly, we note "even in a public forum the government may impose reasonable restrictions on the time, place or manner of protected speech, provided the restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.' (*Clark* v. *Community for Creative Non-Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984); see *Heffron* v. *International Society for Krishna Consciousness, Inc.*, 452 U.S. 640, 648, 101 S.Ct. 2559, 2564, 69 L.Ed.2d 298 (1981) (quoting *Virginia Pharmacy Bd.* v. *Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 771, 96 S.Ct. 1817, 1830, 48 L.Ed.2d 346 (1976))." (*Ward* v. *Rock Against Racism* (1989) 491 U.S. 781, 791 [105 L.Ed.2d 661, 675, 109 S.Ct. 2746]; see also *Dulaney* v. *Municipal Court, supra*, 11 Cal.3d at p. 88; *Dillon* v. *Municipal Court, supra*, 4 Cal.3d at p. 869; *H-CHH Associates* v. *Citizens for Representative Government, supra*, 193 Cal.App.3d at pp. 1207-1208.) Trammell Crow's parking lot restriction meets each of these requirements.

1.

■ "The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys. [Citation.] The government's purpose is the controlling consideration. A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." (*Ward* v. *Rock Against Racism, supra*, 491 U.S. at p. 791 [105 L.Ed.2d at p. 675, 109 S.Ct. at p. 2754].) ■ In this case the ban on leafletting in the parking lot is based in Burns's concerns about littering and interference with ingress and egress from the center. Plainly these concerns are unrelated to the message any particular leafletter is attempting to convey.

■ We recognize that a regulation which is not explicitly content related may nonetheless be invalid if the regulation provides officials with unbridled discretion in enforcing it. (*Ward* v. *Rock Against Racism, supra*, 491 U.S. at p. 792 [105 L.Ed.2d at p. 676, 109 S.Ct. at p. 2755].) Such unbridled discretion permits a decision to be based impermissibly on the

content of expression. (*Dillon* v. *Municipal Court, supra,* 4 Cal.3d at pp. 869-870; *H-CHH Associates* v. *Citizens for Representative Government, supra,* 193 Cal.App.3d at p. 1211.) ■■■ Here, however, the parking lot ban provides no discretion—leafletting is prohibited, even, as Burns's letter to the tenant demonstrates, when the leafletting is directly related to the shopping center's business.

2.

In addition to being content neutral, the parking lot ban is also narrowly tailored to meet a significant interest of the shopping center. Our courts have consistently recognized a property owner's interest in controlling litter and traffic. (See *H-CHH Associates* v. *Citizens for Representative Government, supra,* 193 Cal.App.3d at p. 1213: litter problem may justify limitation as to place; *In re Hoffman, supra,* 67 Cal.2d at p. 853: "Persons can be excluded entirely from areas where their presence would threaten personal danger or block the flow of passenger or carrier traffic, such as doorways and loading areas.")

■ Moreover, in determining whether a regulation is narrowly drawn, the United States Supreme Court has held we must give some deference to the means chosen by responsible decisionmakers. (*Ward* v. *Rock Against Racism, supra,* 491 U.S. at p. 798 [105 L.Ed.2d at pp. 679-680, 109 S.Ct. at p. 2757].) "Lest any confusion on the point remain, we reaffirm today that a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate content-neutral interests but that it need not be the least-restrictive or least-intrusive means of doing so. Rather, the requirement of narrow tailoring is satisfied 'so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.' *United States* v. *Albertini,* 472 U.S. 675, 689, 105 S.Ct. 2897, 2906, 86 L.Ed.2d 536 (1985); see also *Community for Creative Non-Violence, supra,* 468 U.S. at 297, 104 S.Ct at 3071. To be sure, this standard does not mean that a time, place, or manner regulation may burden substantially more speech than is necessary to further the government's legitimate interests. Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals. See *Frisby* v. *Schultz,* 487 U.S., at __, 108 S.Ct., at 2502 ('[a] complete ban can be narrowly tailored but only if each activity within the proscription's scope is an appropriately targeted evil'). So long as the means chosen are not substantially broader than necessary to achieve the government's interest, however, the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative. 'The validity of [time, place, or manner] regulations does not turn on a judge's agreement with the responsible decisionmaker concerning the most

appropriate method for promoting significant government interests' or the degree to which those interests should be promoted. *United States* v. *Albertini, supra*, 472 U.S., at 689, 105 S.Ct., at 2906; see *Community for Creative Non-Violence, supra*, 468 U.S., at 299, 104 S.Ct., at 3072." (*Ward* v. *Rock Against Racism, supra*, 491 U.S. at p. 798-800 [105 L.Ed.2d at pp. 680-681, 109 S.Ct. at pp. 2757-2758, fns. omitted; see also *San Andrews' Sons* v. *Agricultural Labor Relations Bd.* (1988) 47 Cal.3d 157, 177-179 [253 Cal.Rptr. 30, 763 P.2d 881]: employer, not court, must establish reasonable restrictions on union organizers right of access to labor camp.)

■ We also note, "[T]he validity of the regulation depends on the relation it bears to the overall problem the government seeks to correct, not on the extent to which it furthers the government's interests in an individual case." (*Ward* v. *Rock Against Racism, supra*, 491 U.S. at p. 801 [105 L.Ed.2d at p. 682, 109 S.Ct. at p. 2759]; see also *Heffron* v. *Int'l Soc. for Krishna Consc.* (1981) 452 U.S. 640, 653-654 [69 L.Ed.2d 298, 309-311, 101 S.Ct. 2559].) Thus, a regulation must be judged by considering all the groups who would have access to a particular forum and the regulation is valid so long as the property owner could reasonably have determined that its interests overall would be served less effectively without the regulation. (*Ward* v. *Rock Against Racism, supra*, 491 U.S. at p. 799 [105 L.Ed.2d at p. 681, 109 S.Ct. at p. 2759].)

■ Judged in light of these principles, Trammell Crow's parking lot ban is appropriately tailored to meet the center's interests. Burns, the responsible decisionmaker, could reasonably conclude, as he did, that without the ban the litter and traffic burden created not just by Savage, but by the center's merchants and other political or religious groups, would make the parking lot unsightly, inconvenient and unsafe for the center's patrons. (See *Heffron* v. *Int'l Soc. for Krishna Consc.*, 452 U.S. 640, 654-655 [69 L.Ed.2d at pp. 310-311].)

### 3.

The parking lot ban on leafletting is especially appropriate in light of the fact Burns's policy does not prevent leafletting on the center's sidewalks. Thus, Savage and other leafletters are not prevented from reaching the center's patrons; rather, they are merely required to hand their leaflets out in person as opposed to placing them on cars.

While we do not doubt access to the parking lot would allow greater and easier distribution of leaflets, the adequacy of alternative channels is not measured by the fondest hopes of those who wish to disseminate ideas. (See *Clark* v. *Community for Creative Non-Violence* (1984) 468 U.S. 288, 295 [88 L.Ed. 221, 228, 104 S.Ct. 3065].) Rather, where, as here, an advocate is

given a realistic opportunity to reach his intended audience, the alternative channels of communication are adequate. (*Ibid.*; see *Frisby* v. *Schultz* (1988) 487 U.S. 474, 483-484 [101 L.Ed.2d 420, 430-432, 108 S.Ct. 2495]; *Renton* v. *Playtime Theatres, Inc.* (1986) 475 U.S. 410 53-54 [89 L.Ed.2d 29, 41-42, 106 S.Ct. 925].)

In sum, Trammell Crow's parking lot ban is a reasonable restriction on the time, place or manner of activities protected by the First Amendment and the liberty of speech clause. The ban is content neutral, narrowly drawn to protect the center's legitimate interests and provides an adequate alternative forum for expression. Accordingly, the trial court did not abuse its discretion in denying Savage's application for a preliminary injunction permitting him to distribute his gospel tracts in the parking lot.

## II

### *Order Dismissing Plaintiff's Complaint* [3]

■ Our obligations in reviewing a dismissal following an order sustaining a demurrer without leave to amend are well established. We deem true all material facts pleaded in the complaint and those which arise by reasonable implication. (*Lewis* v. *Purvin* (1989) 208 Cal.App.3d 1208, 1213 [256 Cal.Rptr. 827].) The plaintiff bears the burden of demonstrating either that the demurrer was sustained erroneously or that sustaining the demurrer without leave to amend was an abuse of discretion. (*Ibid.*) A demurrer may not be sustained without leave to amend where the plaintiff has alleged facts showing entitlement to relief under any possible legal theory. (*Ibid.*)

■ As we have noted, in providing access to shopping centers the court in *Robins* relied on article I, section 2, subdivision (a) of the California Constitution which provides: "Every person may freely speak, write and publish his or her sentiments on *all* subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press." (Italics added.) Moreover, in interpreting this provision our Supreme Court has consistently held that it provides the citizens of this state greater protection than the federal Bill of Rights. "Though the framers could have adopted the words of the federal Bill of Rights they chose not to do so. [Citation.] Special protections thus accorded speech are marked in this court's opinions. *Wilson* v. *Superior Court* (1975) 13 Cal.3d 652, 658 [119 Cal.Rptr. 468, 532 P.2d 116], for instance, noted that '[a] protective provision more definitive and inclusive than the First Amendment is contained in our state

---

[3] Although the trial court's July 26, 1989, order sustaining the demurrer without leave to amend was not appealable (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal § 82, p. 105), the trial court's August 16, 1989, order dismissing Savage's complaint was appealable as a final judgment. (9 Witkin, Cal. Procedure, *supra*, § 75, p. 99.) Under these circumstances Savage's August 6, 1989, notice of appeal is deemed to have been filed immediately after the order dismissing his complaint. (Rule 2(c), Cal. Rules of Court.)

constitutional guarantee of the right of free speech and press.'" (*Robins* v. *Pruneyard Shopping Center, supra*, 23 Cal.3d at p. 908.)

■■■ Despite the broader protection provided by California's Constitution, Trammell Crow and Heritage nonetheless argue Savage may not state any claim under *Robins* because they believe *Robins* provides no protection for Savage's activities. According to the respondents' brief Trammell Crow and Heritage filed in this court, "If Appellant feels the need to express his religious views, he may publish these views in writing, or distribute leaflets in a public park, or telephone others to express his view, or take any of the myriad of other available steps to communicate his thoughts. There is no necessity for Appellant to enter upon private property to express his views, such that the shopping center owner's property rights should be superseded."[4] We do not read *Robins* so narrowly.

■■■ Initially we note that in analyzing the protection afforded religious expression, the United States Supreme Court has recently rejected the very limitation the defendants would have us embrace. "The free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires. Thus, the First Amendment obviously excludes all 'governmental regulation of religious *beliefs* as such.'. . .

"[T]he 'exercise of religion' often involves not only belief and profession but the performance of (or abstention from) physical acts: assembling with others for a worship service, participating in sacramental use of bread and wine, proselytizing, abstaining from certain foods or certain modes of transportation. *It would be true, we think (though no case of ours has involved the point), that a state would be 'prohibiting the free exercise [of religion]' if it*

---

[4]In their petition for rehearing Trammell Crow and Heritage protest they have never asserted a right to bar Savage's activities because of its religious content. This contention is of course at odds with the quoted portion of the argument they made in their respondents' brief. It is also at odds with the points and authorities they filed in the trial court ("If Plaintiff wishes to communicate his religious views to others, it is not essential for him to impose upon the constitutionally protected rights of Defendants"). More importantly Trammell Crow's and Heritage's current position conveniently ignores Del Norte Plaza's "Rules and Regulations Relating to Use of Shopping Center Property for Purposes of Political Expression." As we have seen these rules define "political expression" as petitioning political bodies or "disseminating political information"; as we have also seen the rules do not permit "any activity other than Political Expression [as defined]." On their face these rules completely bar Savage's attempt to disseminate religious as opposed to political information. If this prohibition against nonpolitical expression is enforceable under *Robins*, plainly Savage has no valid claim against the operators of Del Norte Plaza and the trial court did not err in sustaining the demurrer without leave to amend. If, on the other hand, *Robins* protects more than the "political expression" permitted in Del Norte's rules, Savage could state a valid claim against the defendants and the demurrer should not have been sustained without leave. Thus, despite defendants' recent protests to the contrary, the record here leaves us no choice but to discuss the distinction between the dissemination of political information permitted by Del Norte Plaza's rules and Savage's efforts to disseminate strictly religious information.

*sought to ban such acts or abstentions only when they are engaged in for religious reasons* [italics ours], or only because of the religious belief that they display. It would doubtless be unconstitutional, for example, to ban the casting of 'statues that are to be used for worship purposes,' or to prohibit bowing down before a golden calf." (*Employment Division, Department of Human Resources of Oregon* v. *Smith* (1990) 494 U.S. __, __ [108 L.Ed.2d 876, 884-885, 110 S.Ct. 1595].) The same principle was articulated in *Widmar* v. *Vincent* (1981) 454 U.S. 263, 277 [70 L.Ed.2d 440, 452, 102 S.Ct. 269], where a state university permitted only nonreligious use of its facilities: "Having created a forum generally open to student groups, the University seeks to enforce a content-based exclusion of religious speech. Its exclusionary policy violates the fundamental principle that state regulation of speech should be content-neutral, and the University is unable to justify this violation under applicable constitutional standards."

 We recognize courts have distinguished certain types of speech as being entitled to less protection under the First Amendment. Thus it has been stated that "Not all speech receives the same degree of constitutional protection. '[O]bscene material is unprotected by the First Amendment.' (*Miller* v. *California* (1973) 413 U.S. 15, 23 [37 L.Ed.2d 419, 430, 93 S.Ct. 2607].) And the Constitution 'accords a lesser protection to commercial speech than to other constitutionally guaranteed expression.' (*Central Hudson Gas & Elec. Corp.* v. *Public Serv. Comm'n* (1980) 447 U.S. 557, 563 [65 L.Ed.2d 341, 349, 100 S.Ct. 2343].) *Freedom of ideological expression, on the other hand, is a central First Amendment value. 'Ideological expression, be it oral, literary, pictorial, or theatrical, is integrally related to the exposition of thought—thought that may shape our concepts of the whole universe of man.'* (*VA. Pharmacy Bd.* v. *VA. Consumer Council* (1976) 425 U.S. 748, 779 [48 L.Ed.2d 346, 369, 96 S.Ct. 1817] (conc. opn. of Stewart, J.) quoted, *Metromedia, Inc.* v. *San Diego* [(1981) 453 U.S. 490,] 505, fn. 12 [69 L.Ed.2d 800, 813].)" (*City of Indio* v. *Arroyo* (1983) 143 Cal.App.3d 151, 157-158 [191 Cal.Rptr. 565], italics added.) The defendants have not cited, and we have been unable to find, any case which creates any differential between the protection afforded religious expression and the protection provided for political activities.

Indeed, the facts in cases which enforce California's liberty of speech clause demonstrate no material distinction between the political and religious nature of expression. For instance in *Robins* itself the student plaintiffs were attempting to solicit support for "Zionism." According to the American Heritage Dictionary (1976) page 1489, "Zionism" is "A plan or movement of the Jewish people to return from the Diaspora to Palestine." Despite the obvious religious element of their activity, the Supreme Court held the students had the right to circulate a petition opposing a United

Nations' Zionism resolution. (*Robins* v. *Pruneyard Shopping Center, supra*, 23 Cal.3d at p. 911.)

Similarly in *Carreras* v. *City of Anaheim* (9th Cir. 1985) 768 F.2d 1039, members of the International Society for Krishna Consciousness sought an injunction permitting them to solicit donations outside the Anaheim convention center and Anaheim stadium. Again, despite the religious nature of the plaintiffs' activity, the court found the city could not enact an ordinance which prohibited their activities. Relying on California's liberty of speech clause the court said: "[T]he ordinance on its face violated the California Constitution by discriminating between regulated and unregulated speech on the basis of its content." (*Id.* at p. 1048.)[5]

Although there is no authority which allows us to denigrate the value of religious expression in our society, the defendants nonetheless contend the holding in *Robins* protects only people who wish to engage in political activity. The defendants place particular emphasis on the fact that in *Robins* the Supreme Court relied on the right of the people to petition their government (Cal. Const., art I, § 3.), as well as the liberty of speech clause, in finding that the shopping center operator in that case could not prevent the student plaintiffs from promoting Zionism. "[W]e stress . . . that to prohibit expressive activity in the centers would impinge on constitutional rights beyond speech rights. Courts have long protected the right to petition as an essential attribute of governing. [Citation.] The California Constitution declares that 'people have the right to . . . petition government for redress of grievances . . . .' (Art. I, § 3.) That right in California is, moreover, vital to a basic process in the state's constitutional scheme—direct initiation of change by the citizenry through initiative, referendum, and recall. [Citations.]" (*Robins* v. *Pruneyard Shopping Center, supra*, 23 Cal.3d at pp. 907-908.)

We do not read the court's reliance on the right of the people to petition the government as permitting a restriction on the religious content of the activities the court was protecting. Such a limitation is inconsistent with the language of the opinion itself: "To protect *free speech* and petitioning is a goal that surely matches the protecting of health and safety, the environ-

---

[5]The practical problems posed by adopting the distinction the defendants propose are highlighted by Savage's brief itself. In his attempt to show us Judge O'Neill's religious affiliation disqualified him, Savage produced a wholesale attack on the political activities of the Roman Catholic Church. Savage argues there was collusion between the Vatican, Benito Mussolini, Francisco Franco and Adolph Hitler. He suggests Catholic priests were responsible for the assassination of Abraham Lincoln and that the Vatican was engaged in a conspiracy to control the legislative and judicial branches of our government. Savage's arguments could be characterized as political statements in which case the defendants presumably would permit him to distribute copies of his brief at their shopping center. They might also be characterized as religious tracts which defendants would prohibit.

ment, aesthetics, property values and other societal goals that have been held to justify reasonable restrictions on private property rights." (*Robins* v. *Pruneyard Shopping Center, supra*, 23 Cal.3d at p. 908, italics added.) The defendants' interpretation is also inconsistent with the court's other opinions in the area. For example, the court has stated: "The shopping center may no more exclude individuals who wear long hair . . . who are black, who are members of the John Birch Society, or who belong to the American Civil Liberties Union, merely because of these characteristics or associations, than may the City of San Rafael." (*In re Cox* (1970) 3 Cal.3d 205, 217-218 [90 Cal.Rptr. 24, 474 P.2d 992], fn. omitted.)

More importantly the defendants' interpretation of *Robins* would place it at odds with the federal Constitution. After our Supreme Court decided *Robins*, the property owners appealed to the United States Supreme Court and the court agreed to hear their appeal. In *Pruneyard Shopping Center* v. *Robins* (1980) 447 U.S. 74 [64 L.Ed.2d 741, 100 S.Ct. 2035], the Supreme Court affirmed the judgment in *Robins*, finding that although under its earlier opinion in *Lloyd Corp.* v. *Tanner, supra*, 407 U.S. 551, California was not required to give the students access to the shopping center, California could, in exercising its police powers, require greater access than mandated by the federal constitution. (447 U.S. at p. 81 [64 L.Ed.2d at pp. 751-752.) However, the court was careful to point out the state's power to impose such burdens on the use of private property could not "amount to a taking without just compensation *or contravene any other federal constitutional provision*." (*Id.* at p. 81 [64 L.Ed.2d at p. 752], italics added.) As we have seen, under *Widmar* v. *Vincent, supra*, 454 U.S. at page 277 [70 L.Ed.2d at page 452], although the state may not be required by the Constitution to provide a forum for the exercise of free speech rights, when it does provide such a forum, as California clearly has, it may not restrict use of the forum on the basis of the religious content of a speaker's message. Under the defendants' interpretation of *Robins*, however, that is precisely what our Supreme Court created: a forum which permits expression of political ideas, but not religious ones. We reject such an interpretation.

Finally, as we have noted, the court in *Robins* carefully considered the burdens it was placing on the operators of shopping centers and gave them the power to regulate the time, manner and place of free speech activities. (*Robins* v. *Pruneyard Shopping Center, supra*, 23 Cal.3d at pp. 910-911.) There is nothing in this record, however, which suggests the burden imposed by unpopular religious expression is any greater than the burden created by unpopular political expression. ▮▮▮▮ Indeed it is difficult to imagine how Savage's gospel tracts would create any greater

interference with the business of Del Norte Plaza than leaflets distributed by proponents or opponents of the death penalty or gun control.[6]

In sum then, we reject the defendants' contention they had the power to ban religious expression.[7] Under *Robins* they were required to permit Savage to engage in religious as well as political expression at Del Norte Plaza. Since the record demonstrates the defendants' policy was to prohibit all nonpolitical expression at the center, it follows Savage could allege a cause of action against them. Thus the trial court abused its discretion in sustaining the defendants' demurrer without leave to amend.

### III

*Bias*

Code of Civil Procedure section 170.2 provides in part: "It shall not be grounds for disqualification that the judge: [¶](a) Is or is not a member of a racial, ethnic, religious, sexual or similar group and the proceeding involves the rights of such a group." Thus Judge O'Neill had no power to disqualify himself on the basis of his membership in the Roman Catholic Church; accordingly he did not err in denying Savage's motion for rehearing.

Judgment of dismissal reversed; order denying preliminary injunction and order denying rehearing affirmed.

Todd, Acting P. J., and Huffman, J., concurred.

Petitions for a rehearing were denied October 17, 1990, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied December 13, 1990. Mosk, J., and Broussard, J., were of the opinion that the petition should be granted.

---

[6] We note however that while regulations based on the content of the speaker's message are not permissible, the means employed to convey a message are subject to regulation. Thus the government may validly draw a distinction between distributing leaflets and soliciting donations. (*U. S.* v. *Kokinda* (1990) 497 U.S. __ [111 L.Ed.2d 571, 110 S.Ct. 3115].)

[7] The defendants also argue Del Norte Plaza should not be made subject to *Robins* because it is smaller than the Pruneyard Shopping Center discussed in that case. We find no material difference between the two shopping centers. According to Savage, Del Norte Plaza consists of 14 acres; the Pruneyard was on 21 acres (*Robins* v. *Pruneyard Shopping Center, supra,* 23 Cal.3d at p. 902). According to Burns, the manager of Del Norte Plaza: "The Plaza's major tenants include a supermarket, drug store and movie theater. It also contains a Newberry's, a Value Craft, several restaurants, 40 smaller retail shops, and automobile parking facilities." In comparison, the Pruneyard contained "65 shops, 10 restaurants, and a cinema." (*Robins* v. *Pruneyard Shopping Center, supra,* 23 Cal.3d at p. 902.) Thus although the Del Norte Plaza is somewhat smaller than the Pruneyard, the differences do not suggest Del Norte Plaza is any less important or accessible as a place to promote ideas. (See *id.* at p. 906.)